IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: ANHEUSER-BUSCH BEER | ) | CASE NO.:    1:13 MD 2448 |
| LABELING, MARKETING AND SALES | ) | ALL CASES |
| PRACTICES LITIGATION | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| | ) | |

This matter is before the Court on Defendant's Motion to Dismiss. (ECF #13).  Plaintiffs filed

a Memorandum in Opposition to Defendant's Motion, and Defendant filed a Reply.  (ECF #16, 18).

The Court heard oral arguments on the motion at a status conference, and following arguments, the

parties were both allowed to file supplemental briefs in support of their positions.  (ECF # 20, 21).

Having carefully considered all of the pleadings, briefings, arguments, and relevant law, the Court

finds that Defendant's motion should be GRANTED.


**PROCEDURAL HISTORY**

This case, captioned In Re: Anheuser-Busch Beer Labeling Marketing and Sales Practices

Litigation, was transferred to this Court by the United States Judicial Panel on Multidistrict

Litigation ("the Panel"), pursuant to 28 U.S.C. § 1407.   Plaintiffs from a Northern District of

California action moved for centralization of their case and five other actions pending against

Anheuser-Busch Companies LLC ("Anheuser-Busch") in five other districts, including, the District of Colorado, the District of New Jersey, the Northern District of Ohio, the Eastern District of Pennsylvania, and the Northern District of Texas.  (ECF #1).[1]  The Panel granted the motion for centralization, created this Multi-District Litigation ("MDL"), and assigned it to the this Court.  Following the original transfer, two additional cases, including a second action from the Northern District of California, and an action from the Middle District of Florida were added to the MDL.  (ECF #2).

Following transfer, the Plaintiffs filed a Consolidated Amended Class Action Complaint ("Complaint"), which merged all of the proposed state class action allegations from the transferred cases, and added a proposed nationwide class action brought under Missouri law. (ECF #11).  Defendant filed a motion to dismiss the entire Complaint based on Plaintiffs' failure to allege any deviation in labeling of the alcohol content of the products at issue that exceeded the regulatory tolerance of 0.3 percent.  In addition, Defendant claims that Plaintiffs failed to plead any compensable damages.  The motion to dismiss was fully briefed by all parties, and the Court heard oral arguments, off the record, at a status conference held on December 10, 2013. (ECF #19).  The parties then both filed supplemental briefs in support their respective positions. (ECF #20, 21).

### REGULATORY CONTEXT

The Federal Alcohol Administration Act ("FAAA"), 27 U.S.C. §§ 201, *et seq*., enacted in 1935, governs the manufacture and sale of alcohol nationwide.  The federal agency charged with implementing and enforcing the FAAA is the Alcohol and Tobacco Tax and Trade Bureau

---

[1]

("TTB"), formerly known as the Bureau of Alcohol Tobacco and Firearms.  The FAAA empowers the TTB to adopt regulations that ensure manufacturers  "provide the consumer with adequate information as to the identity and quality of the products, [and] the alcoholic content thereof."  27 U.S.C. § 205(f).  In pursuit of this goal,  under the authority granted to them by the FAAA, the TTB has enacted several regulations specifically addressing the labeling of malt beverage products.  *See* 27 U.S.C. §§ 201-219.

The federal regulation that governs statements of alcohol content on labels of malt beverage products is 27 C.F.R. § 7.71(b)(2). This regulation states:

> [f]or  malt beverages containing 0.5 percent or more alcohol by volume, statements of alcoholic content shall be expressed to the nearest one-tenth of a percent, subject to the tolerance permitted by paragraph (c)(1) and (2) of this section.

The referenced paragraph at 27 C.F.R. § 7.71(c)(1) provides:

> [f]or malt beverages containing 0.5 percent or more alcohol by volume, a tolerance of 0.3 percent will be permitted, either above or below the stated percentage of alcohol.

Other more general regulations relating to the labeling of malt beverages include 27 C.F.R. § 7.29(a)(1), which prohibits the labeling of any malt beverage with

> any statement that is false or untrue in any particular, or that, irrespective of falsity, directly or by ambiguity, omission, or inference, or by the addition of irrelevant, scientific or technical matter, tends to create a misleading impression.

In addition to the federal statutes and regulations, some state and local governments have enacted laws addressing the manufacturing and sale of alcoholic products, including malt beverages.  Often the state and local governments adopt or refer to the federal regulations established under the FAAA in their own statutes and regulations.  It is undisputed that each state at issue in this litigation has adopted the above cited federal statutes and regulations, in some

-3-

form.  Plaintiffs admit that California, Missouri, New Jersey, and Texas have explicitly adopted the TTB's regulations relating to the labeling of alcohol content, and that the remaining states have implicitly adopted these standards through statutes and/or regulations that forbid the sale of any malt beverage product whose label has not been approved by the TTB. (ECF #16, pg. 5). Defendant has provided citations to the state statutes and regulations implementing the adoption of these federal regulations, and these citations are addressed and incorporated into the Court's analysis below.

## ALLEGATIONS IN THE AMENDED COMPLAINT

A.  General Allegations

Plaintiffs allege that Anheuser-Busch possesses technology that allows it to precisely identify and control the alcohol content of its malt beverages to within "hundredths of one percent (0.01%).[2]  Plaintiffs further allege that, nonetheless, Anheuser-Busch routinely and intentionally adds extra water to its finished product to produce malt beverages that "consistently have significantly lower alcohol content than the percentages displayed on its labels."  (Amended Complaint ¶ 17, ECF #11).   This practice allegedly results in consumers receiving "watered down beer containing less alcohol than is stated on the labels of Anheuser-Busch's products." (Amended Complaint ¶ 17, ECF #11).    Plaintiffs contend that Anheuser-Busch follows this process in the manufacturing and labeling of "at least the following products: 'Budweiser'; 'Bud Ice'; 'Bud Light Platinum'; 'Michelob'; 'Michelob Ultra'; 'Hurricane High Gravity Lager'; 'King Cobra'; 'Busch Ice'; 'Natural Ice'; 'Black Crown,' and 'Bud Light Lime.'" (Amended

---

[2]  Plaintiffs allege this is accomplished by the use of "Anton Paar meters" or "in-line" densitometers.  (Amended Complaint ¶19, ECF #11).

Complaint ¶19, ECF #11).

The Complaint acknowledges that there is a relevant federal regulation, 27 C.F.R. §

7.71(c)(1), which states: "For malt beverages containing 0.5 percent or more of alcohol by

volume, a tolerance of 0.3 percent will be permitted, either above or below the stated percentage

of alcohol."  (Amended Complaint ¶ 32, ECF #11).  There is no allegation in the Complaint that

the alleged mislabeling of alcohol content in Anheuser-Busch's products has ever exceeded the

tolerance amount of 0.3 percent.  Further, Plaintiffs have made very clear in their arguments and

statements to the Court that they have not alleged, and they have no reason to believe that

Anheuser-Busch has ever included a statement of alcohol content on its labels that varied by

more than 0.3 percent from the actual alcohol content of the products in question.

Plaintiffs allege that Anheuser-Busch has possessed the technology to precisely measure

the exact alcohol content of its products since "sometime prior to 2008."  The Complaint does

not allege, however, when Anheuser-Busch supposedly began "watering down" its product,

thereby intentionally bringing it below the stated alcohol content on the labels. The named

Plaintiffs have all indicated in their Amended Complaint that the beverages they are complaining

of were purchased during the last four years, which would mean between August 29, 2009, and

August 29, 2013, the date the Consolidated Amended Complaint was filed.

B.  Allegations of Named Plaintiffs

The named Plaintiffs allege the following facts and circumstances related to their

purchases of the Anheuser-Busch products at issue:

● The three named Plaintiffs from California, and the one from Florida, all claim to have
purchased Anheuser-Busch's Budweiser beer  regularly during the last four years.  Each
claims that every bottle of Budweiser that they purchased listed a 5.0 percent alcohol
content by volume, but that the label on each beer purchased over-stated the actual

percentage of alcohol per volume contained in the product.  (Amended Complaint ¶¶ 6-8, 16, ECF #11).

● The three named Plaintiffs from Ohio all claim to have regularly purchased Anheuser-Busch's Budweiser beer during the last four years. Each claims that the labels on these products listed the alcohol content by volume at 5.0 percent. One named Ohio Plaintiff also claims to have regularly purchased Anheuser-Busch's Bud Ice, which had a listed alcohol content by volume of 5.5 percent.  Another claims to have more recently purchased Anheuser-Busch's Bud Light Platinum, which had a listed alcohol content by volume of 6.0 percent.  All three Ohio named Plaintiffs allege that the label on each beer they purchased over-stated the actual percentage of alcohol per volume contained in the product (Amended Complaint ¶¶ 9-11, ECF #11).

● The one named Plaintiff from Colorado claims to have regularly purchased Anheuser-Busch products, including Budweiser, Bud Light Lime, Bud Light Platinum, Michelob Ultra, and Natural Ice during the last four years.  The stated percentages of alcohol per volume were as follows: Budweiser –  5.0 percent; Bud Light Lime – 4.2 percent; Bud Light Platinum – 6.0 percent; Michelob Ultra – 4.2 percent; and, Natural Ice – 5.9 percent. The Colorado named Plaintiff alleges that the label on each beer he purchased over-stated the actual percentage of alcohol per volume contained in the product.(Amended Complaint ¶12, ECF #11).

● The one named Plaintiff from Texas claims to have regularly purchased Anheuser-Busch's products, Bud Light Platinum, Bud Light Lime, and Michelob Ultra, during the last four years.  The stated percentage of alcohol per volume for these products was 6.0, 4.2, and 4.2 respectively.  This Texas named Plaintiff alleges that when he purchased Bud Light Platinum, he specifically chose this product for its higher alcohol content.  The Texas named Plaintiff alleges that the label on each beer he purchased over-stated the actual percentage of alcohol per volume contained in the product.  (Amended Complaint ¶13, ECF #11).[3]

---

[3]

  Defendants submitted Certificates of Approval of Labels for Malt Beverages from the Texas Alcoholic Beverage Commission ("TABC") from December of 2011, approving the label on Bud Light Platinum and showing that the alcohol content in the tested product was actually 0.19% higher than the amount listed on the label.  (ECF #13-2, at 22).  The same Commission approved labels on Michelob Ultra Light Beer in July of 2009 which did not include any alcohol content statement on the label.  (ECF #13-2, at 16). Other products with labels approved by the TABC in the four years prior to the filing of this Complaint include Budweiser Black Crown, with a tested alcohol content that was 0.17% above the stated amount on the label, and King Cobra Malt Liquor, which had a tested alcohol content that was 0.28% below the stated amount.  (ECF #13-2, at 10, 24).  Although these submissions are not relevant in our determination on a motion to dismiss, because we must accept the allegations in the Complaint as true, they show that contrary to implications

-6-

All of the above named Plaintiffs (those from California, Florida, Ohio, Colorado, and Texas) claim that they would not have purchased the Anheuser-Busch products at issue if they had known the stated alcohol content on the label was false, and each claims to have stopped purchasing the Anheuser-Busch products at issue when they became aware of the alleged false labeling practices of Anheuser-Busch.  Each of the above named Plaintiffs also claims that they "might resume purchasing" the relevant Anheuser-Busch products "if and when [they] learn that [the products] are accurately labeled." (Amended Complaint  ¶¶ 6-13, 16, ECF #11).

● The one named Plaintiff from New Jersey claims to have regularly purchased Anheuser-Busch's product, Michelob Ultra, during the last four years.  He claims that each bottle of Michelob Ultra he purchased had a label listing the alcohol by volume at 4.2 percent.  The New Jersey named Plaintiff alleges that the label on each beer he purchased over-stated the actual percentage of alcohol per volume contained in the product. (Amended Complaint ¶ 14, ECF #11).

● The two named Plaintiffs from Pennsylvania claim to have regularly purchased Anheuser-Busch's product, Budweiser, during the last four years.  Both claim that every bottle of Budweiser they purchased listed a 5.0 percent alcohol content by volume, but that the label on each beer purchased over-stated the actual percentage of alcohol per volume contained in the product.  (Amended Complaint ¶ 15, ECF #11).

The named Plaintiffs from New Jersey and Pennsylvania have not claimed that they stopped purchasing the products at issue even after having discovered the alleged false labeling practices of Anheuser-Busch.  (Amended Complaint ¶¶ 14-15, ECF #11).  They do allege that they "took [Anheuser-Busch]'s stated percentage of alcohol into account in making their purchases and would not have purchased [the Anheuser-Busch product] had they known that

_____

contained within Plaintiffs' briefing and at oral argument, the Defendants do contest that the product labels at issue in this case under-represented the actual alcohol content of the products at issue.

[Anheuser-Busch]'s representations were false." (Amended Complaint ¶¶ 14-15, ECF #11).

No named plaintiff from any state claims to have purchased any of Anheuser-Busch's Michelob, Hurricane High Gravity Lager, King Cobra, Busch Ice, or Black Crown products.

C.  Class Allegations and Class Certification Definitions

The class allegations seek to certify classes that include all consumers within defined geographic areas "who purchased at retail for offsite personal, family or household purposes and not for re-sale" one of the above listed Anheuser-Busch products, within an identified time frame. (Amended Complaint ¶ 43, ECF #11).  The Complaint seeks to certify a national class for members who have purchased one of the previously listed Anheuser-Busch products within the last five years;[4] separate California, Ohio, Texas, and Florida state class actions for consumers who have purchased the relevant products within the last four years; a Colorado state class action for members who have purchased the relevant products within the last three years; and separate Pennsylvania and New Jersey class actions for members who have purchased the relevant products "within the statutory time period."[5] (Amended Complaint ¶¶ 43-50, ECF #11).

The proposed class definitions do not include any requirement that: (1) the class members took alcohol content into account during their purchases; (2) they would not have purchased the products at issue had they known at the time of purchase that the label contained false information relating to the alcohol content; or, (3) they stopped purchasing the products at issue when they became aware of the alleged false labeling practices of Anheuser-Busch.

---

[4]

No named plaintiff is alleged to have purchased the Anheuser-Busch products at issue prior to August of 2009, which was four years before the filing of the Consolidated Amended Complaint.

[5] The "statutory time period" referenced in these allegations is never defined.

(Amended Complaint ¶¶ 43-50, ECF #11).

D.  Causes of Action Asserted

       The Complaint raises proposed state class action claims under the consumer protection laws of seven separate states.[6]  The proposed federal class action also asserts a state law claim under Missouri's Merchandising Practices Act, Mo.Ann.Stat. ¶¶ 407.010, *et seq*., alleging nationwide jurisdiction because "one or more of the malt beverages" identified in the Complaint was manufactured in Missouri. (Amended Complaint ¶¶ 62-66, ECF #11).  Plaintiffs from California, Colorado, Ohio, Texas, Pennsylvania, New Jersey, also bring claims under the Magnusson-Moss Warranty Act, 15 U.S.C.A. § 2301, *et seq*..  (Amended Complaint ¶¶ 98-105, 119-126, 163-169, 189-196, 212- 219, 234-241.  Additionally, the Ohio Plaintiffs raise common law claims of fraudulent misrepresentation and unjust enrichment.  (Amended Complaint ¶¶ 170182, ECF #11).

## STANDARD OF REVIEW

       In evaluating a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff, accept its factual allegations as true, and draw reasonable inferences in

---

[6] Cal. Bus. & Prof. Code § 17200, *et seq*.; Cal. Health & Saf. Code, § 109875, *et seq*; Cal. Civ. Code § 1750, *et seq*.; Cal. Com. Code § 2314; Colo. Rev. Stat. §§ 6-1-101, *et seq*.; Colo. Rev. Stat. Ann. § 4-2-314; Ohio Rev. Code § 1345.01, *et seq*.; Codified Ordinances of Cleveland § 641, *et seq*.; Ohio Rev. Code §1302.26; Tex. Bus. & Com. Code §§ 2.314 and 1741, *et seq*.; Tex. Civ. Prac. & Rem. Code § 38.001(8); Texas Deceptive Trade Practices Act (DTPA) § 17.50; 73 P.S. § 201-1, *et seq*.; 13 Pa. C.S.A. §§ 2314(a) and 2314(b)(6); Pennsylvania Unfair Trade Practices Act and Consumer Protection Law (UTCPL), 73 P.S. § 201-1, *et seq*.; 13 Pa. C.S.A. §§ 2314(a) and 2314(b)(6); New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq*.; New Jersey Commercial Code, N.J.S.A. § 12A:2-314.; and, Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) §§ 501.201, *et seq*.. (Amended Complaint ¶¶ 67-97, 106-118, 127-162, 183-188, 197-211, 220-233, 242-269, ECF #11).

favor of the plaintiff.  *See Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  The court will not, however, accept conclusions of law or unwarranted inferences cast in the form of factual allegations.  *See Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000).

In order to survive a motion to dismiss, a complaint must provide the grounds of the entitlement to relief, which requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action.  *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).  That is,"[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* (internal citation omitted); *see also Association of Cleveland Fire Fighters v. City of Cleveland*, No. 06-3823, 2007 WL 2768285, at *2 (6th Cir. Sept. 25, 2007) (recognizing that the Supreme Court "disavowed the oft-quoted Rule 12(b)(6) standard of *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed.2d 80 (1957)").  Accordingly, the claims set forth in a complaint must be plausible, rather than conceivable.  *See Twombly*, 127 S. Ct. at 1974.  Conclusory allegations, or legal conclusions asserted in lieu of factual allegations are not sufficient.  *Bishop v. Lucent Tech, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008).

On a motion brought under Rule 12(b)(6), the court's inquiry is limited to the content of the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account.  *See Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001).  It is with this standard in mind that the instant Motion must be decided. In evaluating a motion for dismissal under Rule 12(b)(6), the district court must "consider the pleadings and affidavits in a light most favorable to the [non-moving party]." *Jones v. City of Carlisle, Ky.*, 3 F.3d. 945, 947 (6th Cir. 1993) (quoting *Welsh v. Gibbs*,

631 F.2d 436, 439 (6th Cir. 1980)).  However, though construing the complaint in favor of the non-moving party, a trial court will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations. *See City of Heath, Ohio v. Ashland Oil, Inc.*, 834 F.Supp 971, 975 (S.D.Ohio 1993).

## ANALYSIS

A. Determination of the Applicable Law

The Federal Alcohol Administration Act, 27 U.S.C. §§ 201, *et seq*., enacted in 1935, conferred authority for the federal regulatory oversight of the beer industry to the Alcohol and Tobacco Tax and Trade Bureau ("TTB"), which is part of the United States Department of Treasury.  (Amended Complaint ¶¶ 28, 33, ECF #11; ECF #13-1 at 5).  In 1993, the TTB issued 27 C.F.R. § 7.71 to specifically address the labeling standards required for malt beverage products.  Section 7.71(a) provides that "[w]hen alcohol content is stated, and the manner of statement is not required under State law, it shall be stated as prescribed in paragraph (b) of this section."  27 C.F.R. § 7.71(a).  Paragraph (b) of § 7.71 requires statements of alcohol content to "be expressed in percent alcohol by volume" and "to the nearest one-tenth of a percent, subject to the tolerance permitted by paragraph (c)(1) and (2) of this section."  27 C.F.R. § 7.71(b)(1) and (2).   The tolerance permitted by subsection (c)(1) is set forth as follows: "[f]or malt beverages containing 0.5 percent or more alcohol by volume,[7] a tolerance of 0.3 percent will be permitted, either above or below the stated percentage of alcohol."  27 C.F.R. § 7.71(c)(1).

Defendant has asserted, and Plaintiffs have not contested, that if the Court finds that Anheuser-Busch's alleged over-reporting of alcohol content is permitted under 27 C.F.R. §

---

[7]  All of the products at issue in this case contain 0.5 percent or more alcohol by volume.

7.71(c), this action must be dismissed.[8]  It is undisputed that every state connected to the

Complaint in this case has adopted the labeling standards set forth in 27 C.F.R. § 7.71, either

explicitly or implicitly.   *See* Cal. Bus. & Prof. Code § 25204(a); Mo. Code Regs. Ann. title 11, §

70-2.060(l); N.J. Admin. Code § 13:2-27.1; 16 Tex. Admin. Code § 45.79; Colo. Code Regs. §

203-2, Regulation 47-904(F), (G); Fla. Stat. Ann. § 563.045; Fla. Admin. Code Ann. R. 61A-

4.005; Alcohol Brand/Label Registration, Fla. Dep't of Bus. & Prof'l Regulation; Ohio R.C. §

4301.10(A)(8)(b); Ohio Admin. Code § 4301:1-1-43(D)(3); Div. of Liquor Control, Beer & Wine

Section, Ohio Dep't of Commerce, Application for Product Registration; 47 Pa. Stat. Ann. § 4-

493(7); 40 Pa. Code § 9.108.

Having adopted the tolerance set forth in 27 C.F.R. § 7.71(c), these states cannot enforce

general legislation that would prohibit conduct specifically permitted under this tolerance

provision.  Long held and universally accepted principles of statutory construction require courts

to apply the more specific provision of law, whenever a specific provision and general provision

of the law are in conflict.[9]  *Morales v. TransWorld Airlines, Inc*., 504 U.S. 374, 384 (1992);

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012).   In other

words, when there is a statute or regulation that directly addresses a particular issue, that statute

or regulation must be applied in place of any general legislation that could otherwise have been

---

[8]

 Plaintiffs have not disputed this premise in any of their briefing, and Plaintiffs' counsel
explicitly conceded this point at oral argument.

[9]

  The United States Supreme Court has long made clear that the general tenants of statutory
construction apply with equal force to administrative regulations adopted pursuant to
properly delegated Congressional authority.  *See generally, e.g.*, *Sprietsma v. Mercury
Marine*, 537 U.S. 51, 62-63, 123 S. Ct. 518, 526 (2002); *Babbitt v. Sweet Home Chapter of
Cmyts for a Greater Or.*, 515 U.S. 687, 115 S. Ct. 2407 (1995).

considered applicable to the issue. *See Katz v. Fid. Nat'l Title Ins. Co.*, 685 F.3d 588, 596 (6th Cir. 2012). By adopting the specific tolerance for over and understatements of alcohol content established in 27 C.F.R. § 7.71(c)(1), each state at issue in this action has legalized conduct allowed by the tolerance and excepted such conduct from any liability under general consumer protection statutes that might otherwise have applied.

In addition, of the eight states involved in this case, at least seven have explicitly adopted or applied the "safe harbor" doctrine which precludes civil remedies for conduct that is expressly permitted under federal or state law. *See* Colo. Rev. Stat. § 6-106(a); Fla. Stat. Ann. 501.212(1); Ohio R.C. § 1345.12(A); *see e.g., Kuenzig v. Hormel Foods Corp.*, 505 F. App'x 937 (11th Cir. 2013); *see, e.g., Bergmoser v. Smart Document Solutions, LLC*, 268 F. App'x 392, 395 (6th Cir. 2008); *see Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 541-42 (Cal. 1999); *see, e.g., Grace v. St. Louis Cnty.*, 348 S.W.3d 120, 126-27 (Mo. Ct. App. 2011); *Daaleman v. Elizabethtown Gas Co.*, 390 A.2d 566 (N.J. 1978); *Fay v. Erie Ins. Grp.*, 723 A.2d 712, 715 (Pa. Super. Ct. 1999). Defendant has not cited, and the Court is not aware of any Texas statute or common law case that explicitly adopts or applies the safe harbor doctrine in that state. However, Plaintiffs and Defendant agree that Texas has adopted the TTB's regulation allowing a 0.3 percent tolerance. Further, neither has disputed that if Anheuser-Busch's alleged conduct is legally permitted under the tolerance established in 27 C.F.R. § 7.71(c)(1), none of the state consumer laws cited in the Complaint apply, and this case must be dismissed in its entirety.

B. Interpretation of 27 C.F.R. §7.71(c)(1)

When interpreting a statute or regulation, courts must, in the first instance, focus on the plain wording of the provision at issue. *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63, 123

-13-

S. Ct. 518, 526 (2002) (citing *CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732 (1993)); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 56, 108 S. Ct. 376 (1989).   If the words of a statute or regulation are unambiguous, "the plain meaning of the text must be enforced." *Jimenez v. Quaterman,* 555 U.S. 113, 118, 129 S. Ct. 681 (2009); *United States v. Plavcak*, 411 F.3d 655, 661 (6th Cir. 2005); *see also*, *Cty. of Oakland v. Fed. Housing Finance Agency,* 2013 WL 2149964 (6th Cir. 2013); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002).

There may be circumstances in which vagueness or ambiguity in the legislative language compels a court to look beyond the words employed to discern the meaning of a statute or regulation.  However, neither vagueness nor ambiguity exists in the present case.  On its face, 27 C.F.R. § 7.71(c)(1) is clear, specific, and unambiguous:  "For malt beverages containing 0.5 percent or more alcohol by volume, a tolerance of 0.3 percent will be permitted, either above or below the stated percentage of alcohol."  27 C.F.R. § 7.71(c)(1).  There is no dispute that the Anheuser-Busch products at issue are malt beverages containing 0.5 percent or more alcohol by volume and that the stated percentage of alcohol on the labels of these products is within 0.3 percent of the actual percentage of alcohol in the product.

Despite this seemingly straightforward match between the regulation and the agreed upon facts in this case, Plaintiffs present several arguments in an attempt to modify or, in their words, "clarify" the plain and unambiguous language set forth in the regulation.   Plaintiffs set forth three primary arguments in their quest to create an intention based exception to the tolerance established in § 7.71(c)(1).  First, Plaintiffs argue that this Court should exercise its equitable powers to prevent Anheuser-Busch from profiting in any way from a knowing misrepresentation

-14-

of the stated alcohol content in its malt beverages.  Second, Plaintiffs argue that if § 7.71(c)(1) is

read to allow intentional misrepresentations within the tolerance range, it would conflict with the

language and purpose of the broader statutory and regulatory framework applicable to the sale of

alcoholic beverages.  Third, Plaintiffs argue, in effect, that the regulation should be considered

ambiguous because the word  "tolerance" as used in § 7.71(c)(1) is a term of art and the

regulatory agency did not mean for it to be given its plain and ordinary meaning.  Plaintiffs

contend that "tolerance" when used as a term of art, excludes intentional variances from a stated

goal.  Each of these arguments is addressed, in turn, below.

     1.  <u>Equitable/Moral Considerations</u>

Plaintiffs argue that it would inequitable and indeed unsavory to allow Anheuser-Busch

to make intentional misstatements of the true alcohol content in products, even if those

misstatements fall within the tolerance range specifically created and approved by that section.

Therefore, Plaintiffs urge the Court to exercise its inherent interpretive and equitable powers to

create an exception to the tolerance when a misstatement of alcohol content, no matter the

degree, is knowing or intentional.   The problem is that the regulation itself does not distinguish

between intentional and unintentional variances from the stated percentage.  Neither does it

identify any circumstances or exceptions that would preclude application of the 0.3 percent

tolerance for any malt beverages containing more than 0.5 percent alcohol by volume.  There is

no stated or referenced exception based on intent, actual knowledge, precision of available

measuring technology, or the size and profitability of the manufacturer.

A court cannot add language to a regulation that is unambiguous on its face, nor can it

import or manufacture exceptions that were not included by the enacting agency.  *See Univ. Of*

-15-

*Texas Sw. Med. Ctr. V. Nassar,* 133 S. Ct. 2517, 2528 (2013)(a court may not "conclude that what Congress omitted from the statute is nevertheless within its scope."); *Sexton v. Panel Processing, Inc.*, 2014 U.S. App. LEXIS 8752, *6-9 (6th Cir. May 9, 2014) (finding that the court should neither subtract from nor add to the words adopted by the legislature); *Tran v. Gonzales*, 447 F.3d 937, 941 (6th Cir. 2006); *Detroit Receiving Hosp. & Univ. Health Ctr. v. Sebelius*, 575 F.3d 609, 613 (6th Cir. 2009).   "To supply omissions transcends the judicial function."  *Iselin v. United States*, 270 U.S. 245, 251 (1926)(per Brandeis, J.).  The court's inherent power to fashion an equitable and just resolution is subordinate to valid statutory and regulatory directives.  *See, generally, Law v. Siegel*, 2014 U.S. LEXIS 1784, **11-14, 134 S. Ct. 1188 (2014).

Courts should not imbue legislative or administrative enactments with their own policy preferences.  They are the instruments of the law, not the creators, and the will of the legislature, an entity that is directly accountable to the people,  should be the only policy reflected in judicial decisions.  See *Osborn v. Bank of the United States*, 22 U.S. 738, 866 (1824)(per Marshall C.J.).  Not only does such deference to legislative choices advance the judiciary's role of applying the law to the specific circumstances in the case before it, it also places the political burden of deciding what actions and omissions are punishable, and what actions and omissions are innocuous enough to be tolerated, on the backs of the elected officials who are accountable to the public.

If a regulation or piece of legislation is not desirable, does not match the will of the citizens, or was, for any other reason, improvidently enacted or articulated, the legislative body has the power to revoke it or to modify it to conform more specifically to their intents and purposes.  It is not the court's role to presume their collective intention, second guess their policy

choices, or save them from their own mistakes or misstatements.  Therefore, this Court declines the Plaintiffs' invitation to modify § 7.71(c)(1) to conform to Plaintiffs' view of what is proper policy and what should be punishable behavior, regardless of whether the Court may agree or disagree with Plaintiffs' opinions on the policies at issue.

 2. Statutory and Regulatory Conflicts

  a.  Reconciling 27 C.F.R. § 7.7.1(c)(1) with the TTB's General Intent

 As stated above, Plaintiffs contend that the tolerance allowed by § 7.7.1(c)(1), if applied to intentional misrepresentations of alcohol content, would conflict with the FAAA and TTB's implementing statutes and regulations, as well as with their general intent and purpose.  Plaintiffs cite several cases in support of the proposition that even plainly worded statutes and regulations must be considered in the context of the statute as a whole, and in conformity with the generally expressed legislative policy that spurred the legislation.  *See, e.g., SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 350-51 (1943); *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991); *K Mart Corp. V. Cartier, Inc.*, 486 U.S. 281, 291 (1988)("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").  While it is true that the interpretation of a specific regulatory provision should be informed by the language contained in its regulatory and statutory context, this proposition is still limited by the general caveat that plain and unambiguous language must be interpreted as written. See, *Babbitt v. Sweet Home Chapter of Cntys for a Greater Or.*, 515 U.S. at 697.  Taken in the context of the entire enactment, words should be given the meaning that they would generally convey to reasonable people, at the time they were written.  As set forth above, the text creating the tolerance at issue in this case is clear and

unambiguous, and there are no linguistic contextual conflicts created by any of the related statutes and regulations.

Going beyond the text of the regulation and its authorizing legislation to consider the pre-enactment expression of intent or purpose is not a proper method of construing the meaning of a regulation.  Contrary to Plaintiffs' contention, it is not normally true, nor is it advisable, that courts should alter the written words of legislation to mold them to pre-enactment legislative policy or statements of intent or purpose.  *See, Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 246 (6th Cir. 2004)(departure from plain language is disfavored and "appropriate only in rare cases when demonstrably at odds with intentions of the drafters or when language is ambiguous").   "It is always a dangerous business to fill in the text of a statute from its purposes." *Harris v. Commissioner*, 178 F.2d 861, 864 (2d Cir. 1949).   It is equally dangerous to impart intention to legislation based on pre-enactment statements or expressions of intent by legislators. "Every legislator has an intent . . . and the legislature is a collective body that does not have a mind; it "intends" only that the text be adopted, and statutory texts are usually compromises that match no one's preference. Antonin Scalia and Bryan A. Garner,  Reading Law: The Interpretation of Legal Texts (Foreward by Frank Easterbrook at xxii).

Plaintiffs initially cite TTB's statement of intent prior to enacting §7.71(c) in support of their contention that intentional variances cannot be allowed under the tolerance established by that regulation.[10]  However, the TTB's prior intent, even if correctly stated and interpreted by

---

[10]

  Plaintiffs argue that the Court should defer to this statement of intent because "[w]hen an agency interprets its own regulation, the Court, as a general rule, defers to it 'unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Decker v. NW Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013)(citing *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880 (2011)).  The reference to this well accepted premise is misplaced,

Plaintiffs, cannot override the language actually chosen and used in the eventual enactment of the regulation at issue.  A court need not, and should not consider extrinsic sources when determining the meaning of a plainly worded, unambiguous statute or regulation.  *See, Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002)("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what is says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'").  As noted above the tolerance in the regulation itself is not limited by intent, motive, or any other limiting factor or circumstance,[11] and no limitation should be imported based on extrinsic statements of intent or perceived inadequacies.  *Bates v. United States*, 552 U.S. 23, 29, 128 S. Ct. 475 (1997); *Cty. of Oakland v. Fed. Housing Finance Authority*, 2013 WL 2149964, *3 (6th Cir. 2013).

Further, even if the Court were to consider the pre-enactment statements of purpose or intent, construing § 7.71(c) according to its plain language would not contradict or otherwise conflict with the authorizing statute or the legislative policy behind the regulation.  The statement of intent is as follows:  "The intent of these tolerances is to provide for normal production and

---

however. A statement of intent, released prior to the enactment of a regulation is not an agency interpretation of that regulation and is not entitled to the same deference.  Further, the TTB, even through its statement of intent has not addressed whether the tolerance covers intentional as well as unintentional variations from the stated alcohol content.  Rather, Plaintiffs have used certain of the TTB's words, in isolation, to create their own interpretation of the regulation.  As will be explained below, the Plaintiffs' interpretation of the TTB's intent statement cannot be reconciled with the TTB's decision to enact the tolerance regulation and is inconsistent with the language chosen by the TTB when it was enacted.   Also, an agency's interpretation cannot be considered if the regulation is clear and unambiguous.  *See Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

[11]  No intent-based exception was contained at the notice and comment stage of the regulation's enactment either. 58 Fed. Reg. 21,228.

analytical variables while continuing to ensure that the labeling does not mislead the consumer."

TTB Procedure 2004-1.  Plaintiffs argue that this statement clearly establishes that the regulation

was meant to address only normal production and analytical variables, and that it, therefore,

cannot be applied to allow the intentional under-reporting of alcohol content.  This statement,

while expressly addressing the variations inevitably caused by normal production and analytical

variables, does not indicate an intent to preclude application of the tolerance to variances arising

from other causes.  Nor does it express any intent to except manufacturers who demonstrate an

ability to precisely limit or control such variables, or who knowingly under-report alcohol

content for any reason.   There is no explicit contradiction between the statement of intent and

the enacted regulation, and, therefore, no reason to support any limitation to the application of

the tolerance based on criteria not explicitly  included in the text.

In addition, any perceived conflicts Plaintiffs have highlighted can easily be resolved by

viewing the statement of intent in its own full context.  Throughout their arguments, Plaintiffs

have focused solely on the specific language that feeds their own interpretations, while glossing

over additional language in the statement that may elucidate the TTB's more basic intent and

purpose.  With regard to the TTB's intent when issuing § 7.71(c), Plaintiffs focus solely on the

statement that the tolerance intended to allow for " normal production and analytical variables."

However, if we are to examine the TTB's intent, then we must look to all of the relevant

statements the TTB has made regarding their purpose in issuing labeling regulations.

The FAAA has authorized the TTB to adopt regulations that "will prohibit malt beverage

labeling "from containing any statement which is false, deceptive, misleading, or is likely to

mislead the consumer regarding the product."  58 Fed. Reg. at 21, 228.  The TTB has stated that

the purpose of the labeling regulations is to ensure that consumers are provided with adequate information to inform their purchase of malt beverages. 27 U.S.C. § 201(f); 27 C.F.R. § 7.29(a)(1); TTB Procedure 2004–1. Viewed with this overarching purpose in mind, it would be reasonable for the TTB to consider statements to be misleading or deceptive when they interfere with the consumer's ability to obtain information adequate to inform their purchase. An understanding of TTB's overall purpose, paired with it's statement of intent which says that the 0.3 percent tolerance will continue to "ensure that the labeling does not mislead the consumer," makes clear that the TTB believed that statements within the tolerance would not misled the consumer, and would not compromise the adequacy of information needed to make an informed choice. Any other conclusion would create an irreconcilable conflict between the tolerance adopted in § 7.71(c)(1) and the TTB's stated purpose and intent in regulating labeling for alcoholic beverages. Whether or not this Court agrees with such a conclusion, Congress entrusted the TTB with broad discretion in this area and courts should be extremely reluctant to invalidate a policy determination, especially when it can be reasonably reconciled with the overarching statutory scheme and purpose. *See, Babbitt*, 515 U.S. at 708.

Plaintiffs' argument that the tolerance is, in fact, incapable of reasonable reconciliation with the statutory purpose of prohibiting misleading and deceptive labeling is fatally flawed. Plaintiffs argument requires a finding that unintentional misstatements within the range of the 0.3 percent tolerance do not create a misleading or deceptive label, but intentional misstatements do. If the purpose of TTB regulations is to ensure that consumers are provided with adequate information to inform their purchase of malt beverages, and to ensure that the labeling does not mislead or deceive the consumer, the information provided must be reliable and adequate in all

cases.  An intentional 0.3 percent misstatement of alcohol content by volume has no different effect on the nature or adequacy of information available to the consumer than does an unintentional misstatement of the same degree.[12]

In other words, the materiality of the misstatement is not affected by the motivation behind it.  If the TTB considered a misstatement within 0.3 percent of the actual alcohol content to be misleading, it would be misleading regardless of whether the misstatement was intentional or unintentional, and whether it resulted from normal production and analytical variables or from any other cause.   Therefore, if allowing a 0.3 percent tolerance in stated alcohol content caused by normal manufacturing variables does not undermine the TTB's intention of ensuring the consumer is provided with adequately reliable information, then neither does allowing a 0.3 percent tolerance caused by any other circumstances.

Section 7.71(c) can be given its plain meaning without contradicting or compromising the legislative policy that led to its enactment, simply by accepting that the TTB does not consider a 0.3 percent variance from actual alcohol content to be misleading to the consumer.  While no one, least of all this Court, should condone intentional misrepresentations, we also cannot manufacture liability based solely on the motive behind an immaterial misrepresentation.  If, as

---

[12]

  The Court need not address Defendant's argument relating to an alleged lack of damages because the Motion to Dismiss is being granted on other grounds, however, it bears noting that because every single product currently available for consumption could potentially have the same understatement of alcohol content under the tolerance regulation adopted by the TTB, it may be impossible for Plaintiffs to show that consumers suffered any damages caused by Anheuser-Busch's alleged overstatement of alcohol content.  Similarly, any damages or liability that would require a showing of reasonable reliance could be precluded.  Because the TTB allows a 0.3 percent tolerance, no consumer can reasonably expect that any individual product contains more than 0.3 percent less than the stated alcohol content on the label.

in this case, an unintentional misstatement is presumed to be harmless and immaterial, harm does not suddenly manifest simply because the intention behind the statement changes.

     b. <u>Reconciling 27 C.F.R. § 7.71(c) with Related Statutes and Regulations</u>

In addition to arguing that an intentional variance from the stated alcohol content conflicts with the TTB's regulatory intent, Plaintiffs make the related argument that§ 7.71(c)(1) must be considered in the context of the statutory and regulatory scheme as a whole. In support, they cite the United States Supreme Court's holding in *Dada v. Mukasey*: "[i]n reading a statute we must not 'look merely to a particular clause,' but consider it 'in connection with the whole statute.'" *Dada v. Mukasey*, 554 U.S. 1, 16 (2008) (citing *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974)). While this premise is true, it does not directly address how courts are to reconcile separate statutes and regulations that fall within the same statutory or regulatory framework. When attempting to reconcile two distinctly separate statutes or regulations, courts cannot allow a previously enacted general statute or regulation to override the plain and unambiguous language of a later enacted, more specific statute or regulation. Rather, they are to review all of the relevant statutory and regulatory framework together in context and in accord with the general principles of statutory construction. The general principles of statutory construction require that, when possible, the court interpret the statutes and regulations so as to avoid conflicts and give meaning to all. "It cannot be presumed that any clause in [a legal text] is intended to be without effect; and therefore such a construction is inadmissible, unless the words require it.*"* *Marbury v. Madison*, 1 Cranch 137, 174 (1803). When such a reading is not possible, the more specific, more recent enactment takes precedence. *See Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 384 (1992)(in statutory construction "the specific governs the general"); *RadLAX*

*Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012)(when "a general permission or prohibition is contradicted by a specific prohibition or permission". . . "the specific provision is construed as an exception."); *Katz v. Fid. Nat'l Title Ins. Co.*, 685 F.3d 588, 596 (6th Cir. 2012)( a specific statute trumps a general statute when rules of statutory construction are applied). For the reasons set forth below, Plaintiffs' suggested interpretation of § 7.71, considered in context with the TTB and FAAA's implementing regulations as found in 27 C.F.R. § 7.29(a)(1) and 27 U.S.C. § 201, *et seq.*, would not give meaning to all of the regulations, nor does it favor the more specific, more recent enactment.  Rather, Plaintiffs' attempt to reconcile § 7.71(c)(1) with the implementing statutes and regulations would render § 7.71(c)(1) entirely meaningless.

Plaintiffs' interpretation of § 7.71(c) is based in part on their assertion that the FAAA and the TTB's implementing regulations prohibit "[a]ny statement that is false or untrue in any particular, or that, irrespective of falsity . . . tends to create a misleading impression," 27 C.F.R. § 7.29(a)(1),  and that they require labeling and advertising to "provide adequate information to consumers concerning the identity and quality of the product" in order to "prevent misleading labeling...that may result in consumer deception regarding the product." 27 U.S.C. § 201, *et seq.*. Plaintiffs contend that reading §7.71(c) to allow the 0.3 percent tolerance even in the case of deliberate misstatements would "subvert the entire combined statutory and regulatory scheme, which was specifically designed to prevent consumer deception."  (ECF #21, pg. 2)  They argue that any amount of intentional imprecision in labeling is misleading and barred by the general purpose of the TTB regulations as articulated in the implementing statute and regulations.  This viewpoint, however, ignores the plain language of § 7.71(c), and creates a distinction of intent

not present in *any* of the cited statutes or regulations.

Under Plaintiffs' reading of the FAAA and TTB's implementing statutes and regulations, there could be no reason to allow the 0.3 percent tolerance up or down under any circumstances. Because the implementing regulations appear to allow no room for *any* potentially misleading statements, regardless of truth or falsity, even unintentional variations allowed by the § 7.71(c) tolerance would violate this principle if they could be considered to be even potentially misleading. However, as discussed in the section above, a broader look at the language within the implementing statute and regulations reveals that the true focus of these regulations is to provide the consumer with "adequate information... concerning the identity and quality of the product, [and] the alcoholic content thereof." 27 U.S.C. § 201(f). The TTB expanded on this original statement of purpose explaining that statements, whether true or false, whether incomplete, overstated, ambiguous, or obfuscated by irrelevant or overly technical information, must not create a misleading impression that affects a consumer's ability to make an informed decision about the product. See 27 C.F.R. § 7.29(a)(1) and (4). By eliminating any consideration of the actual truth or falsity of the statements, the TTB has made clear that the adequacy of the information provided to the consumer is judged solely by its impact on the consumer. Neither the veracity of the statements nor the means and methods of creating a misleading impression are to be considered in determining this effect.

Further, 27 C.F.R. § 7.29(a)(4) requires the TTB to prohibit any statement or representation that it "finds to be likely to mislead the consumer." This means that if the TTB thought a label with a 0.3 percent variation from the actual alcohol content would be "likely to mislead the consumer," such variation could not be tolerated under any circumstances. In that

case, the general regulations cited above would eviscerate the more recent and more specialized

regulation establishing the 0.3 percent tolerance.  Such an interpretation would be unacceptable

under the long held canons that provisions should be read harmoniously, and specific provisions

prevail over general.  Specifically, one legislative provision "is not to be allowed to defeat

another, if by any reasonable construction the two can be made to stand together," Thomas M.

Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of

the States of the American Union* 58 (1868); see also, *City of Philadelphia v. Ridge Ave.

Passenger Ry. Co.,* 102 Pa. 190, 196 (1883)(finding that a construction which defeats the purpose

and object of the statute is absurd).  Further,  when general and specific provision conflict, the

specific is treated as an exception to the general rule.  See, e.g., *Radzanower v. Touch Ross &

Co.*, 426 U.S. 148, 153 (1976)(per Stewart, J.)*; Morales v. Trans World Airlines, Inc*., 504 U.S.

374, 384 (1992)(in statutory construction "the specific governs the general"); *RadLAX Gateway

Hotel, LLC v. Amalgamated Bank*, 132 S. Ct.  2065, 2071 (2012)(when "a general permission or

prohibition is contradicted by a specific prohibition or permission". . . "the specific provision is

construed as an exception."); *Sexton v. Panel Processing, Inc.,* 2014 U.S. App. LEXIS 8752, *6

(6th Cir. May 9, 2014); *Katz v. Fid. Nat'l Title Ins. Co.*, 685 F.3d 588, 596 (6th Cir. 2012)( a

specific statute trumps a general statute when rules of statutory construction are applied). This

Court, therefore, cannot accept a reading of the general implementing regulations that would

render a later enacted, specialized regulation meaningless.

The TTB clearly chose to enact § 7.71(c)(1), allowing a 0.3 percent tolerance up or down,

with full knowledge and acceptance of the more general policies and goals outlined above.

Further, they chose to enact § 7.71(c)(1), allowing that tolerance, without including any

exclusions based on manufacturer's intent or the reasoning for misstating the alcohol content within the accepted range.  Section 7.71(c) is easily reconciled with the FAAA/TTB implementing statutes and regulations, if we simply accept that the TTB has reasonably determined that a stated alcohol content accurate to within a  0.3 percent in either direction provides adequate information to identify the nature and quality of the product,  and that any variation within that range is not significant enough to be considered misleading and/or deceptive.

This presumption, considered in context of the language set forth in the implementing statutes, is bolstered by an understanding of the relative insignificance of a measure of 0.3 percent alcohol content by volume.  The TTB has determined that anything less than 0.5 percent alcohol content is not enough to affect the alcoholic impact of a malt beverage product, as evidenced by 27 C.F.R.  § 7.71(e), which deems a  malt beverage to be non-alcoholic if it has less than 0.5 percent alcohol content by volume. Thus, it should not be surprising that the TTB would accept that a discrepancy of up to 0.3 percent in the alcohol content labeling of a malt beverage product is not significant enough to be misleading or deceptive, nor is it important enough to adversely impact the adequacy of information necessary to allow for informed customer decision-making with regard to these products.

In short, Plaintiffs' attempts to detract from or modify the plain and unambiguous language of § 7.71(c)(1) based on its relationship to other statutes, regulations and statements by the TTB are unavailing.   First and foremost, the regulation must be applied as written, not as modified by any extrinsic information or material.  *See Livingston v. Story*, 34 U.S. 632, 641 (1835)("The first rule in the construction of a statute is to follow the letter.").  Secondly,

Plaintiffs' attempt to reconcile the tolerance established in § 7.71(c)(1) with the overall statutory and regulatory context they have cited would, taken to its logical conclusion, prohibit acceptance of the tolerance in any and all circumstances, not just in cases of intentional misrepresentation as alleged in this case.   Finally, enforcing the tolerance as written, without exclusion or exception is consistent with an expressed intent and purpose of the related statutory and regulatory scheme. Presuming, as we must, based on their statements and the evidence discussed above, that the TTB does not consider a 0.3 percent variance from actual alcohol content to be misleading to the consumer, §7.71(c) may be applied as written without contradicting or compromising the legislative policy that led to its enactment.

      3.   <u>The Meaning of "Tolerance"</u>

      The words of a statute or regulation "are to be taken in their natural and ordinary significance and import; and if technical words are used, they are to be taken in a technical sense." James Kent,  *Commentaries on American Law* 432 (1826).   The word "tolerance" is undefined in the regulation.  When terms are undefined, '[t]he everyday understanding" and "regular usage' of the term should instruct the Court's interpretation.  *Lopez v. Gonzales*, 549 U.S. 47, 53, 127 S. Ct.  625 (2006).   Common sense, non-technical interpretations are the default.  *Cty. of Oakland v. Fed. Housing Finance Authority*, 2013 WL 2149964, *3-4 (6th Cir. 2013).   The parties do not dispute that the ordinary meaning of the word "tolerance" is "the allowable amount of variation in any specified quantity."  See 4 *Supplement To The Oxford English Dictionary* 899 (R.W. Burchfield Ed., 1986); see also *Webster's Third New International Dictionary* 2405 (Philip Babcock Grove, et al., eds., 1976 ("the allowable deviation from a standard").   In its ordinary usage, a "tolerance" is not limited or nullified by the intent,

motivation, or cause behind a variation or deviation.  Thus, if given its ordinary meaning, there can be no dispute that the tolerance established in 27 C.F.R. § 7.71(c)(1) is to be afforded without regard to the cause or intent behind any deviation of 0.3 percent or less between the alcohol content listed on the labels and the actual alcohol content within the regulated products.

Plaintiffs argue, however, that the word "tolerance" should not be afforded its ordinary meaning, but should be considered to be a term of art that allows only "unintentional deviations" from the goal of absolute accuracy.  (ECF #16).  Plaintiffs have offered no legal or industry specific authority for this proposition.  They have offered no source from the TTB or any other agency related to the regulation of alcoholic beverages and/or labeling standards in any food or beverage industry.  They have failed to cite any definition of the word "tolerance" in any dictionary, manual, handbook, or other source that limits the word "tolerance" to the acceptance of "unintentional deviations."   In fact, the sources cited by Plaintiffs reinforce the ordinary dictionary meanings set forth above: "a value fixing the limit of allowable error or departure from true performance or value;" "the specified amount a feature is allowed to vary from nominal;" "how close to the nominal (or exact) location, size, form or orientation a feature on a part must lie . . . ;" "the permissible deviation from the desired value."  (See citations at ECF #21, pg. 4-5).  Not one of these cited dictionaries or handbooks imparts any exclusion based on intent or causation into the definition of a "tolerance."   The only citations Plaintiffs have been able to find that reference intent are a variety of random sources on statistical quality control and procedures.  None of these sources have any connection to the regulation of alcoholic beverages, or other food and beverage labeling; none are sanctioned by the FAAA; none are authored by the

TTB, or seemingly any other federal regulatory agency;[13] and, none makes any attempt to define the word "tolerance" as being an "unintentional" or "accidental" variance or deviation.  In short, none of these sources are relevant in any way to the issue before the Court in this case.

On the other hand, Defendants have cited other regulations adopted by the TTB that would tend to support the position that the word "tolerance" does not subsume a requirement that a deviation or variance is unintentional.  In fact, the TTB has explicitly added an intent exception to tolerance requirements in other regulations.  For example,  27 C.F.R. § 27.42a creates a tolerance for the allowable amount of carbon dioxide in wine.  This regulation adds an explicit prohibition against intentionally adding carbon dioxide to reach the limits of the tolerance range.  Other examples include 27 C.F.R. § 25.142(d) and 27 C.F.R. § 4.37(d) which create a tolerance for "accidental" variations in labeling the net contents of beer and wine.[14]  No explicit restriction for accidental or unintentional variations would be necessary if the word "tolerance" itself was a term of art meaning "an acceptance of accidental or unintentional variations or deviations."  See,

---

[13]

  Plaintiffs do cite to the NIST's Handbook 44, which states that "[e]quipment owners should not take advantage of tolerances by deliberately adjusting their equipment to have a value, or to give performance, at or close to the tolerance limit.  Nor should the repair or service personnel bring equipment merely within tolerance range when it is possible to adjust closer to zero error."  Handbook 44, section 2.3, found at http://www.nist.gov/pml/wmd/pubs/hb44-14.cfm..  The NIST, though a federal agency regulates measuring devices and does not regulate alcoholic beverages, or the labeling of such.  The NIST has no authority over, and its Handbook 44 has no relevance to, the labeling of alcoholic beverages.  There are no allegations that Anheuser-Busch has adjusted its measuring equipment to take advantage of a tolerance in its measuring equipment or that it has violated Handbook 44 in any way.

[14]

  These examples also provide persuasive evidence that the TTB knew exactly how to word a regulation in order to exclude intentional misstatements of content if that was what it intended to do.  No such exclusion or limitation exists in the tolerance established under 27 C.F.R. § 7.71(c)(1).

*Burlington N. & Santa Fe Ry. Co. V. White*, 548 U.S. 53, 63 (2006)("[w]here words differ ... Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *United States v. Butler*, 297 U.S. 1, 65 (1936)(per Roberts, J.)("These words cannot be meaningless, else they would not have been used.").

There is no legal or other relevant authority that would support giving the word "tolerance" anything other than its ordinary meaning. The parties do not dispute and, in fact, have both cited multiple consistent definitions of the word "tolerance" that make no distinction between the acceptance of intentional and unintentional deviations from the desired value. Therefore, the clear and unambiguous language contained in 27 C.F.R. § 7.71(c)(1) eliminates liability for any over or under-statement of alcohol content on malt beverage labels so long as the stated content is within 0.3 percent of the product's actual alcohol content. The protection afforded by § 7.71(c)(1) is provided without regard to the cause of any deviation or variation, and without regard to the intention behind any misstatement of alcohol content within the defined tolerance range.

## **CONCLUSION**

As understandable as it may be for Plaintiffs to feel slighted by a misrepresentation they believe was knowing and intentional, the law has always required Plaintiffs to show more than just the a violation of a principle in order to maintain a cause of action. In this case, the TTB has determined that a misstatement of alcohol content within a 0.3 percent range is not significant enough to be actionable. Therefore, it created a legally permissible range of tolerance for misstatements of alcohol content. For whatever reason, be it lack of perceived harm, expediency of enforcement, a desire to create a level playing field within the industry, or a mere lack of

foresight, the TTB chose to apply that tolerance universally without regard to whether the misstatements were intentional or accidental.  Every principle of statutory construction requires this Court to apply the tolerance as written, without modification or limitation.  Consequently, there is no legal basis upon which to allow this case to continue.  As such, the Defendant's Motion to Dismiss must be granted.  Plaintiffs, however, are not without recourse.  As with any legislative enactment that withstands judicial scrutiny, it could still be changed through proper legislative means.  If the perceived injustice at issue in this case is as important to Plaintiffs as they have suggested through the course of this litigation, they can make their concerns known to the TTB and lobby for changes in the regulation.  Defendant's Motion to Dismiss (ECF # 13) is GRANTED.  This case is dismissed with prejudice.  IT IS SO ORDERED.


   /s/Donald C. Nugent      
Donald C. Nugent
United States District Judge

Date:   June 2, 2014